May it please the Court, Keith Wesley for the Plaintiff and Appellant Ironhawk Technologies, Inc. Two points should be kept in mind at all times when considering this appeal. First, we are here on the grant of a summary judgment. Therefore, to paraphrase the Supreme Court in and all justifiable inferences are to be drawn in its favor. In other words, for every piece of evidence or fact or inference mentioned in Dropbox's brief or mentioned by my colleague on the other side today, it is imperative to assess if there is a contrary piece of evidence or fact or inference cited by Ironhawk. Second, the issue of likelihood of confusion in a trademark case is intensely fact-intensive and rarely appropriate for summary judgment. Therefore, this Court regularly reverses grants of summary judgment on likelihood of confusion and has stated that summary judgment should be used, quote, sparingly and, quote, reluctantly. Here, Ironhawk presented evidence that could be favorable on each of the sleep craft factors. Mr. Wesley, before you get into the sleep craft factors, it seems to me that the threshold question that we as a Court here must resolve that has some bearing on several of these sleep craft factors is what the relevant consumer class is here. And I'd like to know your best argument and authority that the consumer class should extend beyond the Navy in your case. Absolutely, Your Honor. And I think Your Honor previewed where I was going to go in terms of what the relevant class is. It is not simply limited to the Navy. And that's true for two separate reasons. It's true as a matter of evidence because we presented evidence that we also target and promote and have, in fact, sold to commercial customers. So we had a deal with CVS, the commercial pharmacy. We were targeting Dropbox itself, which is a commercial entity. But let me ask you about your deal with CVS. I mean, that was many years ago. It was a contract for, I think, $3,200 or $2,300. I don't remember exactly. But I'm trying to figure out, you know, how do we define these potential future clients that I think is referred to in it? And what do we look at to determine who those are? I mean, you had that one client outside the Navy a number of years ago. And is that enough? Is a single meeting enough with any potential future clients? Or is just some email correspondence enough? If you could help me and point me to any, you know, authority or any case to help illuminate us on that, I would appreciate it. Sure, Your Honor. Well, the case is Reardon LLC versus Reardon Commerce, 683 F3D 1190 Pennsite 1215, 9th Circuit, 2012. And the issue in that case was exactly what Your Honor is relevant or is confusion amongst other groups, including potential customers, retailers, anyone in the market. And the 9th Circuit held that it's the latter, that it's not limited just to current customers. And it said, I quote, it is well established that confusion on the part of potential customers may be relevant. And so we're not just limiting a trademark owner to its current customers. I think that's right. I think that's right. But the question then is, you know, how strong is the record as to say your efforts to reach out to this potential consumer class? You know, I think Judge Borgia's question implies that they were pretty spotty and pretty in between, and there's nothing consistent, no consistent showing that you tried to, you know, expand your potential customer base. I mean, all these years, and still, you're only customer is the Navy, right? Well, all these years, our current customer is the Navy. We did have other customers, including... Well, you had one other customer at one time, as far as the record shows, right? We did. And we also... You did? Yes. We had CVS, and we also have had other governmental agencies. We had a contract with the Army. But I think the fundamental point... We could expand your potential customer class then to, you know, people who want military hardware or software. We could do that, but we could also expand it to Dropbox itself, because we reached out to Dropbox and said, we have this SmartSync technology, and we think it would go very well with your Dropbox features. And Dropbox said, hmm, that's interesting. We want to hear more. And we had meetings with Dropbox. And so, it's not simply us calling out into the wild, and nobody's listening. We are constantly meeting with other possible commercial customers, and that includes Box.com. And that evidence, your honors, is at ER 1713 through 15. That's the declaration of David Gomes, where he describes exactly what Ironhawk has been doing up to the point of summary judgment. Meetings going on constantly. And so, I don't think it's fair, and I don't think it's consistent with this court's jurisprudence to say that if you've been unsuccessful up to this point, that you lose out on a whole body of potential customers. If we do conclude that the military, and I understand your arguments, and I understand what the law is. I'm just curious, though, I wanted to ask you, if we do conclude that the military, or the Navy, I guess even more narrow than that, has historically been your primary market, is your main customer base here, does that mean that Dropbox wins? No, your honor. It does not, because once again, to conclude that would be to view the evidence in Dropbox's favor, and any inferences in Dropbox's favor. And I say that because one inference that we can all, I think, reasonably make is that members of the Navy do things other than serve our country. Their people, just like you, myself, anyone on the cutting them off from commercial applications in their own homes. Counsel, with respect, I want to follow up on Judge McGeehan's question. You have stated that you had CVS as a client. Yes. Was the product offered under the SmartSync trademark that you offered to CVS exactly the same as the product that was sold and offered to the Navy? Well, there's a suite of products, all of our products are named SmartSync, and I don't know specifically which component SmartSync part, or which component files or technology was licensed to CVS versus the Navy, but they were all SmartSync, because that's all. Is that in the highly negotiated, highly developed set of software program or programs that the Navy used, it went through all kinds of tests, a lot of expensive things, very expensive license. And you say that you, not least, you had CVS as a customer. And my question again is, was that same software that you worked so hard to get the Navy to buy what you offered to CVS? Our SmartSync software was offered to both the Navy and to CVS. That is clear. You said the same software? That's my understanding. For example, you said Microsoft has Office 365. Well, it's got at least four components, probably more. So if you offered Word, hypothetically, to the Navy, and you offered something else like Excel to CVS, is that the same? Do we take that into account in terms of whether you had clients, other clients under this trademark? Well, I think so, because the relevant trademark in your hypothetical, Judge Smith, is that you're selling Excel to one company and Word to another company. So those are two separate product names, two separate barks. Here, we're selling SmartSync to CVS, and we're selling SmartSync to the Navy. And so we're selling same trademark to a commercial customer as well as to the Navy. So from your perspective and from the record, it does not matter what the trademark actually covered as long as there is a trademark, even though the product may be entirely different. In this case, your thing is not. But if it just whirls apart, as long as it had the name SmartSync, it was covered. Is that your position? Well, I'm not sure I understand the court's question. If we're selling a SmartSync piece of software to one company and a slightly different SmartSync piece of software to another company, then I think all of that use inures to our trademark strength, to our trademark use, to our trademark validity. And my hypothetical, and that's all it is in this case, is, well, let's assume that the software sold to the Navy was light years different than what you sold to CVS. Does it matter as long as it's covered by the same trademark? I don't think it matters, and I think this goes to one error of the district court, which is we can't slice too thinly the are the products on goods that could reasonably be bought by the buying public to come from the same source. So if it's a software product and a much different software product, the public will reasonably think they come from the same source. It's not ketchup versus CDs. I think I'm close to... Do you want to save the balance of your time? Please do. Please do. Okay, Ms. Brinkman, you're representing Dropbox, I believe. Please proceed. Thank you, Your Honor. May it please the court. Your Honors, this is an easy case. It's an easy case because it involves different products used for different purposes, bought by different customers through different marketing channels, and both parties use their company names along with the mark in the marketplace so that the customer sees right there the name of the company whose product it is at the same time it sees the mark. And the plaintiff's product requires that the buyer, the Navy, take significant care and attention. Buyers need to figure out whether Ironhawk's product is So any way you look at this case, likelihood of confusion is wholly implausible. Ms. Brinkman, a question I asked your friend here across the aisle, Mr. Wesley. So what is your best argument on the threshold question of who the relevant consumer class is here? The Navy seems to be maybe a bit narrow, and there's some indication that this includes any future buyer of the product. So how would you have us define that? What's your authority? As Your Honor pointed out, the record here is clear that there's been only one non-military purchase. That was by CVS once in 2013, and at pages 65 to 66 of our brief we calculated that it's 0.119 percent of their revenue. That's at excerpts of record 2045. And we think that that is just implausible on this record to go beyond that. But that doesn't matter. We would still prevail here even if there were some other CVS. And that's because of all these other factors. And in particular, I want to focus on the fact, and it goes to your other question, Judge Smith's question about the CVS and what they care that has to be given here to purchase Ironhawk's product is significant. It's a middleware feature. It has to be integrated into the system that the enterprise already has. At supplemental excerpts of record 367 to 69, Ironhawk talks about how they have to customize it. So it goes to the care that has to be paid attention that just makes it completely implausible that a purchaser would be confused about who they were getting that from. There has to be this IT team who understands whether or not it works with their system. It also goes to how different the products are. And one of the really important factors also that these products are not related under this court's precedent. They do not serve the same use and function. You started out by saying the likelihood of confusion in this case is implausible or highly implausible. But the record, does the record contain a couple of instances of actual confusion? And since we're in summary judgment, what do we do with that evidence? The evidence that Ironhawk tries to cite as actual confusion evidence is not actual confusion. The district court correctly looked at that. If I can just address it in three parts. There are some pre-litigation emails from some resellers that the CEO of Ironhawk himself wrote. Those reseller, right? I don't have time to do that. Do it for me or something like that. Because we're at summary judgment, we don't agree with that. But we accept that. Accept what they say for these purposes. We don't agree with it. But that's another long story. But if you look at that in the most generous light, there are concerns that perhaps confusion could occur. And the only other thing is the CEO saying that maybe two or three times he got questioned at trade shows. I asked the court to look at the Surfvivor case and the Petsmart case. In the Surfvivor case, those are both reverse confusion cases that were affirmed on summary judgment for defendants. Both of them had similar type of purported actual confusion evidence. In Surfvivor, there was one retailer who was actually confused, one customer, and then there That's more evidence than Ironhawk would try and characterize as actual confusion here. And the court said that's just scant. And then in Petsmart, the same kind of, oh, there were questions. There's a specific footnote in Petsmart. Note 7. The court said queries are not actual confusion. There is no evidence of actual confusion on this record. And the district court correctly determined that. The other point I wanted to just make at that same time is this question about summary judgment in trademark cases. Our brief cites five cases at pages 15 to 16 where there have been affirmances of summary judgment for defendants in trademark cases. Three of those are reverse confusions. And I also emphasize, Your Honor, as I just pointed out, in both Petsmart and the Surfvivor and other cases, there are factors that are considered on the other side of the scale. But as a matter of law, looking at those cases and looking at this case, summary judgment for defendant is appropriate here. And Sleekcraft, I think, is such a good guide here. And the way we point out in our brief, any way you look at this case, if you look at the weakness of this mark and the fact that these products are not related and they are not similarly experienced in the marketplace, what is key there is that both parties use their company name, their housemark, with the trademark. That eliminates any confusion there could be. And Ironhawk misreads those cases when they try and say, oh, you know, this is only when there's one party uses it. This is both parties using it. So what do you do with our DreamWorks case? I think that's actually pretty close to this one in the sense of the not very well-known mark versus a really well-known mark. In fact, it was a summary judgment. How do you address DreamWorks? DreamWorks is a very different case, Your Honor, because the relatedness of those marks had to do with the court finding that they were complementary. That's a very different theory. Ironhawk has never not argued that before the district court. Relatedness has to be one of three things. The use and function is the same. You have the same class of customers or you have a complementary mark. And there, Judge Smith, it was because those two, the sci-fi convention was dependent. That was a movie. It was movie merchandise, movie speakers, movie previews. It was dependent on the movie studio and its product. And they benefited from each other. So it was a very closely related aspect there. The other thing I would point out, so that's very different than this case on the relatedness factor where here they're not related at all. Another big difference there is, Your Honor, that that mark is arbitrary. And here, the mark is at the weakest end of the spectrum. It's descriptive. It synchronizes smartly in a better-than-average way. I would urge the court to look at that, at the BADA case, B-A-D-A, the BADA case, which is about micro-precision mark. Very analogous. That, too, was descriptive. It synchronizes and Ironhawk tries to say, oh, well, it says smart. Smart simply says it's better than ordinary. And why is that? Because their product synchronizes for someone who has a connection that has some kind of challenge, like there's an instability or limited bandwidth. That's precisely why the Navy uses it to compress and synchronize data from a base, a military base, to a battleship. That's wholly different. Let me ask you, because I know that your focus or a lot of your emphasis is on relatedness. And in weighing that or reviewing that, I'm just wondering if I could just frame it a little bit differently, the question. Because I think that because it's at the summary judgment stage, couldn't a reasonable jury find that the products here are related? Because they both fall within the field of data management. They both facilitate the sharing of files among a team of users, and they have potential complementary functions or features. Isn't that the question? Or is that not the question that we have to determine at this stage? That's not the question, Your Honor. If I can step back for a minute. Ironhawk confuses the use of the word similar in a couple different aspects of the sleep craft factors. So, there are at least three ways in which the word similar creeps up. Relatedness is about use and function of the product. Then, when you're looking at the strength of the mark, and this being a descriptive mark, smart sync, you can also look to see if it's used in a crowded field. That similarity does not go to whether the products serve the same use and function. That's just more generic field look. Here, there's more than a dozen and a half usage in the general software field. That's the Allstate case. If you look at Allstate, it makes clear that just because two products, the marks may be used in a crowded field or even in the same field, that doesn't mean that the products are related for purposes of that factor. The third way that similarity, of course, is used is whether or not the marks are similarly experienced in the marketplace. We already said they're really not here. That completely eliminates any possibility of confusion because it's undisputed that both Ironhawk and Dropbox use their company names with the mark. If you look at the PetSmart case, that's a very clear support for that. Ironhawk tries to distinguish that because it was a tagline instead of a mark. The same logic applies. Also, I bring the court's attention to their Arcona case. We filed a 28-J letter on that last week. It came out after we did our briefing in October. We had done our briefing before October, so we hadn't realized it was out before Ironhawk's reply briefing. They did not cite it, but we did find it in preparation for argument. Arcona is another case. It was a counterfeit case. It's not a reverse confusion case, but the same rationale applies there. They said in counterfeiting cases, you look at likelihood of confusion also. When you have both companies using their housemark, there's just no confusion. The only confusion could happen if there's a mark out there that doesn't have an identifier. You might wonder at source, but in this case... housemark is not always next to the SmartSync. Does that affect the outcome here? No. The record here is that for Dropbox, for example, the SmartSync feature is simply a user interface. It's a very clever, important user interface for an everyday use of a computer user who wants to see all their files together. You buy it as part of a package on the Dropbox website. Dropbox is part of all of that and is used there. You would necessarily see all of that. That's undisputed. What it does is it allows you to, when you look at your files on your laptop or desktop or whatever, to see both the ones that are stored locally and the ones that you have a Dropbox account where you stored them in the cloud. It doesn't transfer them. Anybody can go and get their cloud files, but you might have to go to the website to do that if you don't have the little user interface that pulls down and lets you do that. It's a very useful and important way of synchronizing your files. What do we do, since you're talking about this function, what do we do with the fact that Ironhawk claims to have, if you will, engaged in a brief romance with Dropbox itself to try to get it to buy its product? What impact, if any, should that have on our thinking? I don't think there was any brief romance at all. I think there was, you know, a call and a rejection. Maybe a lunch for coffee, maybe? Pardon me? Maybe a lunch for coffee? Maybe. Whatever it was, they talked. I'm sorry, your honor. That's all right. I just want to be really clear about the timing, too, because when you read Ironhawk's brief, it conflates these dates. That was back in 2015, a call. The naming happened in 2016 by a naming team. There's no evidence that they had any awareness of this mark. It was only when a trademark check was done that it was found, and it was determined that there were more than a dozen and a half uses of this term. Dropbox is, you know, there was no likelihood of confusion in using it, and they're not using it as a mark. So for all of those reasons, that does not hold water. Okay. Your time is up, but let me ask my colleague whether either has additional questions for Ms. Brinkman. I do not. Thank you. No, thank you. Thank you, your honor. Thank you, Ms. Brinkman. We have Mr. Wesley has a little rebuttal time. Thank you, your honors. Ms. Brinkman says that use of house marks eliminates confusion. In fact, the law in this circuit says that use of house marks exacerbates reverse confusion, and it does not eliminate confusion as a matter of law. And Judge Merguia was correct. The record does show that we do not use SmartSync always with the Ironhawk mark. In fact, at ER 216, there's testimony from our reseller saying people that we market to know us at times by solely Ironhawk. And so a house mark is not going to eliminate confusion for those people. And reviewing that evidence in our favor should lead to the conclusion that us using SmartSync, them using SmartSync, the similarity factor, which has been seen as critical, weighs in our favor, not against us as the district court held. Related goods. We have argued that the goods are complimentary because Dropbox itself met with us and we were discussing whether or not our SmartSync could be used within their Dropbox product suite. That's the very definition of a complimentary good. And where in the record does it indicate the extent of discussion with Dropbox? Ms. Brinkman suggests that there was really nothing to that. They didn't really talk much. Where in the record do you say otherwise? ER 533 through 64, there are emails leading up to the meeting, and if Dropbox didn't think that our goods were potentially complimentary, they would have never had that cup of coffee as Judge Smith characterized it. They would have said, move on. There's nothing there to say. And by the way, their own general counsel said in her trademark search that Ironhawk's trademark is for, quote, similar products and services. Isn't that enough to get to a jury? Isn't that enough? Reviewing the evidence in our favor that a reasonable jury could find that these products are sufficiently similar? Evidence of trademark strength, the district court completely ignored our trademark registration. This court has repeatedly held that a trademark registration, a trademark registered without the need for secondary meaning is prima facie evidence of a strong trademark. The district court below didn't even consider that. Mr. Wesley, unfortunately, your time is up as well. Let me ask my colleagues whether either has additional questions for Mr. Wesley. I do have a question because there's some discussion on whether the mark is descriptive. Ms. Brinkman, pretty clear in her argument that the mark is descriptive, and I know that you have argued in your brief that the mark is suggestive. Do you have any case law that best supports your position that the mark is subjective? Mr. Wesley? Yes. I'm going to murder this name, but I think it's called Zob Mondo, Zob Mondo Entertainment versus Falls Media 602 F38 F3D 1108. That's a 2010 Ninth Circuit opinion indicating that in this type of case where there's a registered trademark with that presumption that the issue is for the jury. And then second of all, there's a case that Lahoti, L-A-H-O-T-I, where the mark was Verachek, and it has some similarities to SmartSync. It's a combination of two different terms, and there it was held that that mark was not descriptive. And we'd also note that it's possible that we have evidence of secondary meaning. Use over five years of a mark is prima facie evidence of secondary meaning. And so even if we were held to be descriptive, we could still be protectable. And so thank you. Other questions by colleagues? No, thank you. I'm good. Do you have any more, Judge Tsushima? No, I don't. Thank you. Very well. So Mr. Wesley, Ms. Brinkman, thank you very much for your very helpful arguments. We appreciate them. The case of Ironheart Technologies, Inc. versus Dropbox, Inc. is submitted, and the court stands adjourned for the day. Thank you. Thank you, Your Honor. Thank you. This court for this session stands adjourned.
judges: Tashima, M. Smith, Murguia